AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Central District of Illinois

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
) Case No. 24-MJ- 7019
A gray Android cellular telephone, as more )
particularly described in Attachment A )
)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A, which is attached hereto and incorporated by reference.

located in the    Central    District of    Illinois    , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B, which is attached hereto and incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
    ☑ evidence of a crime;
    ☐ contraband, fruits of crime, or other items illegally possessed;
    ☑ property designed for use, intended for use, or used in committing a crime;
    ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C, § 471, § 472, and § 473 | Counterfeiting, possessing, and selling counterfeited United States Currency |

The application is based on these facts:
See Affidavit of Special Agent Brent Rothschild, United States Secret Service, attached hereto and incorporated herein by reference.

    ☑ Continued on the attached sheet.
    ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

s/Brent Rothschild
_____
*Applicant's signature*

Special Agent Brent Rothschild, USSS
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
    electronic mail and telephone     *(specify reliable electronic means)*.

Date: 2/13/2024

Eric Long
Digitally signed by Eric Long
Date: 2024.02.13 10:42:12 -06'00'
*Judge's signature*

City and state: Urbana, Illinois     Eric I. Long, Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Brent Rothschild, being first duly sworn under oath, state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the United States Secret Service, in Springfield, Illinois. I have been so employed since January 2009. I earned a Bachelor of Science degree in Criminal Justice from The George Washington University, Washington, D.C. in 1993. In addition to my education background, I was also a police officer in Rockford, IL from 1993-1999 and a Law Enforcement Park Ranger with the United States National Park Service from 2002-2009. During my tenure with the Secret Service, I graduated from the Criminal Investigator Training Program at the Federal Law Enforcement Training Center (FLETC) at Glynco, Georgia and US Secret Service Special Agent Training at the John J. Rowley Training Center (JJRTC), Beltsville, MD. During this training, I studied and completed a variety of classes in law enforcement, criminal investigation, money laundering, and investigative techniques, including search and seizure warrants related to violations of financial crime and related laws.

2. The United States Secret Service is conducting a criminal investigation of violations of Title 18, United States Code, Section 471 (Counterfeiting U.S. Currency), 472 (Possessing Counterfeited U.S. Currency), and 473 (Selling Counterfeited U.S. Currency). Jacob R. Kirkley (KIRKLEY) is the target of this investigation and has been indicted by a federal grand jury for the listed offenses. KIRKLEY was previously arrested by agents of this Service in 2021 for violations of Title 18, United States Code, Sections 471 and 472 and subsequently convicted of those offenses. KIRKLEY was sent

to the Bureau of Prisons for those offenses and released on federal supervised release on May 24, 2023. KIRKLEY also faces a pending petition to revoke his federal supervised release and sold approximately $7500 in counterfeit Federal Reserve Notes (FRNs) to an undercover officer over the course of three controlled purchases.

3. The statements in this affidavit are based on my personal knowledge, and/or on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. I have also discussed this investigation with experienced United States Secret Service Special Agents that have investigated these violations. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are sufficient to establish probable cause to believe that evidence of violations of Title 18, United States Code, Sections 471, 472, and 473 are located on the Subject Telephone.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4. This affidavit is made in support of an application for a warrant to search a gray TCL Android cellular telephone, model number 4188C, IMEI number 916112003274268, using the assigned telephone number 217-286-5023, (hereinafter the "Subject Telephone"), belonging to Jacob Kirkley, which was seized from a vehicle located at #13 North Charlesworth, Bismarck, Vermilion County, in the Central District of Illinois on January 11, 2024, and is currently stored at an evidence locker of the United States Secret Service in Springfield, Sangamon County, in the Central District of Illinois.

## PROBABLE CAUSE

5. The most recent investigation of KIRKLEY began when the Vermilion County Metropolitan Enforcement Group (VMEG) received reports that KIRKLEY was manufacturing counterfeit FRNs and either selling them or passing them through businesses in Vermilion County and possibly cities outside of Illinois. VMEG agents started a case investigation where they conducted undercover buys that involved purchasing counterfeit FRNS from KIRKLEY.

6. At all relevant times, KIRKLEY resided at the aforementioned address in Bismarck, Illinois and was observed twice leaving that residence and meeting with the undercover officer before selling the counterfeit FRNs to the officer.

7. As a part of this investigation, I reviewed the counterfeit FRNs and determined that they lacked the security features found in genuine FRNs. The counterfeit FRNs did not possess the red and blue security threads in the paper; they did not possess the embedded polyester security thread that have inscribed the denomination of the note; they did not contain the color-shifting ink; they did not contain the watermark of the statesperson on the note; and they were not printed on genuine currency paper. Additionally, several of the serial numbers were repeated on the counterfeit FRNs.

8. On December 7, 2023, VMEG Special Agent Patrick Alblinger provided me with copies of suspected counterfeit FRNs that KIRKLEY had previously sold to the undercover officer. This purchase totaled approximately $1,000 in counterfeit FRNs in exchange for $250 in genuine currency. During this purchase, agents observed

3

KIRKLEY leave his residence and meet the undercover officer without stopping anywhere else along the way.

9. On December 10, 11, 12, and 13, the undercover officer sent texts to and received texts from KIRKLEY at telephone number 217-286-5023 to arrange a second controlled purchase of counterfeited FRNs. On December 13, 2023, agents observed a tan colored Dodge Caliber being driven by KIRKLEY leave the area of KIRKLEY's residence. The undercover officer text messaged KIRKLEY several times on this date without receiving a reply from him. KIRKLEY eventually did text the undercover officer and informed the officer that he was going to provide an additional $140 in counterfeit FRNs because some of the FRNs were of poor quality according to KIRKLEY. KIRKLEY asked to meet the undercover officer in the parking lot of a Wal-Mart to conduct the sale of the counterfeit FRNs.

10. Agents observed the vehicle driven by KIRKLEY pull into the area of 4100 North Vermillion Street, which was west of Wal-Mart. The undercover officer met with KIRKLEY in the parking lot, and KIRKLEY handed the officer the $1,140 in counterfeit $20 FRNs in exchange for $250 genuine currency. Serial numbers were duplicated numerous times on the counterfeit FRNs.

11. Agents conducted a third controlled purchase on January 8, 2024. Once again, the undercover officer sent texts to and received texts from KIRKLEY at telephone number 217-286-5023 to arrange the controlled purchase of counterfeited FRNs. On this day, I met with Special Agent Alblinger and VMEG agents. Earlier in the morning, VMEG agents surveilled KIRKLEY'S residence, assisted by a drone.

4

12. The agents saw KIRKLEY leave his residence and meet the undercover officer at a predetermined location in Bismarck, Illinois. KIRKLEY entered the undercover officer's vehicle , where he sold the officer $5200 in counterfeit FRNs for $1250 genuine currency. After the purchase, agents observed KIRKLEY walk back to his residence on foot. I examined a sampling of the counterfeit FRNs, and none of them contained any of the security features of genuine currency.

13. After the January 8, 2024, controlled purchase of counterfeit currency, the U.S. Probation Office filed a petition to revoke KIRKLEY'S supervised release and this Court issued an arrest warrant. On January 10, 2024, agents obtained a federal search warrant for KIRKLEY'S residence at #13 North Charlesworth, Bismarck, Vermilion County, Illinois. On January 11, 2024, the U.S. Marshals Service arrested Kirkley on the outstanding warrant when he visited his probation officer at the U.S. Courthouse in Urbana. Following his arrest, I and Special Agent Alblinger interviewed KIRKLEY and recorded the interview. KIRKLEY admitted selling counterfeit to the undercover officer but denied that he was manufacturing it. He claimed that an individual named Rodney Miles manufactured it. (Agents later interviewed Miles, who denied manufacturing the counterfeit currency or even knowing KIRKLEY.)

14. The same day as the interview, agents executed the federal search warrant at KIRKLEY'S residence. In one bedroom, agents located $2,200 counterfeit FRNs in one drawer in a jewelry box next to the bed and $140 counterfeit FRNs in a separate drawer in the same jewelry box. Paper (consistent with the counterfeit currency) was found on top of the jewelry box. Agents found pigmented ink in two different locations in the

bedroom. They also found torn pieces of counterfeit currency in a metal trash can in the bedroom. In a shed outside the house, agents found two black garbage bags full of torn pieces of counterfeit FRNs.

15. Agents obtained a written consent from KIRKLEY'S mother to search her vehicle after she said that KIRKLEY'S wallet and cellphone were located there. Agents located the Subject Telephone in the vehicle, as well as the wallet. In the front of KIRKLEY'S wallet, agents located $817, which included $770 of the genuine currency given to KIRKLEY by the undercover officer during the January 8 controlled purchase. Agents also found $44 counterfeit FRNs in the front of the wallet. Agents located $140 counterfeit FRNSs in the back of the wallet. In the wallet, they also found two clear plastic baggies containing a crystal-like substance that field tested positive for methamphetamine and weighed approximately 3.7 grams with packaging.

16. The Subject Telephone is currently in the lawful possession of the United States Secret Service following the execution of a search warrant at KIRKLEY'S residence. Therefore, while the United States Secret Service might already have all necessary authority to examine the Subject Telephone, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Subject Telephone will comply with the Fourth Amendment and other applicable laws.

17. The Subject Telephone is currently in United States Secret Service storage in Springfield in the Central District of Illinois. In my training and experience, I know that the Subject Telephone has been stored in a manner in which its contents are, to the

extent material to this investigation, in substantially the same state as they were when the Subject Telephone first came into the possession of VMEG.

18. Special Agent Alblinger has determined that the Subject Telephone is assigned the same telephone number that the undercover officer used to contact KIRKLEY and arrange the purchase of counterfeit FRNs. Thus, the Subject Telephone is likely to contain the text messages between KIRKLEY and the undercover officer related to the controlled purchases. Moreover, the Subject Telephone also may contain data and information, including photographs, videos, or internet searches, related to KIRKLEY's location at the time of the controlled purchases or at the time of the passing of counterfeit FRNs, as well as information, including photographs, videos, or internet searches, regarding any contacts or associates of KIRKLEY who may be involved with purchasing counterfeit FRNs from him, passing counterfeit FRNs, or providing him with materials to counterfeit FRNs.

## **TECHNICAL TERMS**

19. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. Cellular telephone: A cellular telephone (or mobile telephone, or wireless telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and

playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

      b.     Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

      c.     Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

      d.     GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

      e.     PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a

memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

20. Based on my training, experience, and research, I know that the Subject Telephone has capabilities that allow it to serve as a cellular telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

21. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

22. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Subject Telephone was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Subject Telephone because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

9

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

23. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Subject Telephone consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection to determine whether it is evidence described by the warrant.

24. *Manner of execution.* Because this warrant seeks only permission to examine a Subject Telephone already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

25.    I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Subject Telephone described in Attachment A to seek the items described in Attachment B.

s/Brent Rothschild

---

BRENT ROTHSCHILD, Special Agent
United States Secret Service

Eric Long
Digitally signed by Eric Long
Date: 2024.02.13 10:42:38 -06'00'

---

ERIC I. LONG
United States Magistrate Judge

## ATTACHMENT A

### Description Of Property To Be Searched

The property to be searched is a gray TCL Android cellular telephone, model number 4188C, IMEI number 916112003274268, using the assigned telephone number 217-286-5023 (hereinafter the "Subject Telephone"). The Subject Telephone is currently located at an evidence locker of the United States Secret Service in Springfield, Sangamon County, in the Central District of Illinois.

This warrant authorizes the forensic examination of the Subject Telephone for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

### List Of Items To Be Seized

1. All records on the Subject Telephone described in Attachment A that relate to violations of Title 18, United States Code, Sections 471, 472 and 473, and involve Jacob R. Kirkley since May 24, 2023, including:

   a. Text messages, call logs, lists of contacts, and related identifying information, related to manufacturing, possessing, selling, and/or passing counterfeited United States currency, including Federal Reserve Notes;

   b. Any information related to Kirkley's location and/or travel from May 24, 2023, to the present;

   c. Any photographs or videos related to manufacturing, possessing, selling, and/or passing counterfeited United States currency, including Federal Reserve Notes;

   d. Any information, including names, addresses or telephone numbers, of any persons who may be involved as clients or business associates of Kirkley;

   e. Any and all bank records, account information, or other financial records of Kirkley.

2. Evidence of user attribution showing who used or owned the Subject Telephone at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.